McCollum Retirement Sys v. McCollum McCollum Retirement Sys v. McCollum Give me a moment to get my stuff set up. If it pleases the Court, Michael Rogers for Utah Retirement System and the class. Defendants have made a lot of arguments and we'll certainly hear them today. The two primary arguments that they make in their briefs, and I suspect we'll spend a lot of time today with, is number one, they basically instruct the Court below and here to ignore the testimony, the allegations, excuse me, of 15, what we call FEs, former employees, you may call them CWs, 15 whose stories corroborate each other, who come from different divisions within the company. They don't know each other, different locations within the company, and all 15 say the same story. We'll get back to that in a moment. The other story that I expect Mr. Wald will make today, that the defendants have made in their papers, is that the company was facing massive debt and that debt, of course, could lead to bankruptcy. And that the oil market was massively distressed. I agree. Those three predicate facts are true and are important. And they're important because the market, the analysts who are serving as proxy for the investors in Weatherford stock, knew the company was saddled with $7 billion plus in debt. And, of course, everyone knows that if you have that kind of debt, you could be facing bankruptcy. And everyone knew the oil market was very distressed. No one denies that. But what matters is what the defendants told the market in relation to those facts. The market said, and I'm speaking sort of colloquial here, are you guys going to go bankrupt? And the company said no, we're not. Wouldn't even think about it. Not on our minds at all. Are you going to be able to handle the depressed oil market? Are you going to be able to overcome this tremendous debt? Yes, we have a transformation plan. That's going to get us over the hump. And it was those statements. So the fact that the defendants are saying we need to look at the fact that there was debt as some kind of an exculpatory fact, it's not an exculpatory fact. Let me ask you, it seems to me, as I perceive this case, and this is for both sides, it seems to me there's an awful lot that was said in these statements, disclosures of various sorts, that were very optimistic. A fair amount of evidence from the former employees that within the corporation itself, a fair amount of knowledge of the difficulties that the corporation faced. Whether bankruptcy was being considered in 2016, when it was first being considered, all those sorts of facts. But it seems to me under securities law, what Weatherford basically had to do is these forward-looking statements, to the extent they were, or however else you want to characterize some of them, I'm not trying to group them all as forward-looking. The need needed also under securities law to say whatever cautionary statements might exist as to what that optimism was based on. And I don't know if it's based on oil prices returning to a more normal world or just what, but were those sorts of cautionary statements in there? I don't even imagine that we're not going to be able to meet our financial obligations. Were cautionary statements in these disclosures that at least spoke to the need for the industry to turn itself around for all this to work out? Well, I can answer that question in two sentences. But why don't you answer it first factually for me? Well, okay. The factual statements were largely speaking to what I would characterize as problems that any publicly traded company can face. Any publicly traded company is going to face the possibility of liquidation or bankruptcy. If your stock price goes so low that the NYSE delists you, that's going to be a problem for every publicly traded company. And getting to the point of the cautionary language, and I do want to jump back to why it's not relevant, but I'll answer your question first, is because they repeated it over and over again in every one of their statements. Every one of the conference calls with the analyst began with the same boilerplate information. Year after year, K after K, Q after Q, they're repeating the same basic information. We've all seen the wording that goes with the PSLRA safe harbor. It must be narrowly tailored. What they were doing was not narrowly tailored. If circumstances were changing, as the defendants say from year to year, well, shouldn't the cautionary language have changed? The circumstances that may or may not have led to bankruptcy are going to change. They claim we've had a good quarter, so maybe the chance of bankruptcy is more remote. But they're saying the same language quarter after quarter. And I do want to get back to the point I wanted to lead with. The statements that we've alleged as actionable are not forward-looking. The case law on this, I don't have to repeat it. The gentlemen on the bench know the law. Mixed statements of forward and present within the Fifth Circuit and other circuits are dealt with separately. So do we meet the two prongs of not narrowly tailored cautionary language? We do. And as we've alleged, and I can get to in terms of scienter, there's actual knowledge on behalf of the speakers. But the predicate question is, are these forward-looking statements? And they're not. Because what we have is, and I'll just give a couple examples. I won't belabor it. It's completely in the briefing. I apologize. They're saying things, I would love to give you the exact examples. But they're saying things like, we are currently getting forth and looking at the internal factors of the P&L statements. We are currently accomplishing X, Y, and Z in connection. The question that we're saying is, here they go. I apologize for that. Based on all the benchmarking and internal analysis, we have done. Paragraph 267 now. We have made significant progress. Paragraph 276. We are currently executing. 282. We have already made. Those are all statements. Counsel, where's the falsehood in any of those things? Well, the falsehood comes with, the Court has to ask the fundamental question under Rule 12b-6, under the application of any motion to dismiss. The standard is clear in every single circuit. I'm not begging for mercy. I'm stating the law. The allegations in the complaint have to be taken as true. And the inference has to be read through the eyes of the plaintiff. But they also have a heightened standard of pleading for these kinds of things, not only under the fraud pleading requirements, but under the securities fraud pleading requirements. Correct. There's 9b particularity pleading under fraud, and there's the PSLRA. I'll take them one at a time. We have 15 confidential witnesses. You're asking what's the basis for the fallacy. Fifteen confidential witnesses whose stories are corroborated. That's very important. But the FEs are expressing opinions in disagreement with the opinions expressed by other employees of Weatherford, right? No, I don't agree with that, Your Honor. I know Mr. Wald will be saying that. He said it very much in his briefs. But I do not agree with that. We have particularized statements where they have individuals who are at particular places within the company. We have gentlemen. Give me an example of the lie. Who, how, when, where. All right. That demonstrably falls. Okay. I have a lot of papers here. I'm sorry. I apologize for jogging around. This is what happens. You have your outline, and you get knocked off it on the first question, and you've got to dig through your papers. But I'll get to it. We're not behaving up here. I'm sorry. No, you're behaving well. A hot bench is a fun bench. Let's go. FE1 had frank conversations with Defendant Fraser during the class period about the company's financial problems. He frequently interacted with Defendants Fraser and Blanchard. That's FE1. FE3 stated that Defendants McCollum and Bush sent company-wide emails directing employers to direct payments to vendors. A few more about that gentleman. He also sent monthly P&L reports. FE4 joined the transition team. This case is to a large degree about how's the transition plan going. Five, part of the transformation team. FE7 responsibilities included overseeing the corporate set of books, the accounting related to internal transactions with statutory accounting. He reported to Defendant Mills. I could go on. The complaint is a large document. Particularity standard, again, I'll remind the Court of what Fifth Circuit and other standards say. It's not that you have to have particularity for every single conceivable fact. It's sufficiently particularized to meet the standards of 9B. Counsel, Judd Southwick and I are from Mississippi. We remember WorldCom. And in WorldCom, they were cooking the books. And they were false books. And there was knowledge. I mean, I don't know all the ins and outs of the litigation, but I just remember at the time there were false things. They were projecting earnings. They were doing things that were completely contrary to what was actually happening. Where's that here take away the opinions or the disagreements? I have two answers to that. Actually, I have three. One is it's not required. As you know under TELAPS, which is the Supreme Court analysis of scienter, it's recklessness or knowledge. WorldCom is a pre-Sarbanes-Oxley case. I mean, I'm just old enough as a securities lawyer to remember the good old book cooking days. We don't get that too often anymore. Sarbanes-Oxley put an end to that for the good of all of us, obviously. But I want to answer that question pointedly, which is that WorldCom is a paradigmatic case. Just down the road where this case was pending below, we had Enron. We all know the names. That's knowledge. And knowledge is one way of showing scienter. But there's also the reality of the recklessness, which means there is a blatant disregard for the truth of the statements. I would say here we do have knowledge. And to answer your question, we have Defendant McCollum, who made most of the actionable statements, being placed in meetings, quarterly hands-on meetings, an ability to read all of the P&L. There's an example of what you would call reckless. He has the P&L. He can see the internal documents every month, every quarter, whatever you have, to tell him what is happening. And then he's standing up and he's making statements that we are meeting our internal benchmarks. We are accomplishing the goals we set for the transformation plan. Well, either he doesn't know what he's talking about, and that's right. Counsel, let me ask you about this example and tell me whether it's a good example and then fit it into your explanation. We are making material and impressive progress in following the transformation plan. Would that be a good example of where they were violating securities law? I would say that's probably not as strong as some of the ones that I read you a few moments ago. What troubles me there, and while you're going to not embrace it completely as your strongest, but it does seem to me representative of the problem I have in this case, not saying you're wrong and your friend on the other side is correct, but I have difficulty getting my mind around whether this is a violation here. There certainly were statements that seemed to be grounded, like the one I read, in actual events that were occurring. Progress means something where either the debt's being reduced or something's happening that is part of the transformation plan, but the transformation plan may also be just selling off some assets and whatever else or at least making progress that way even if the bottom line has not been affected yet. But it's awful hard to get a handle on a statement like that, and maybe that's because it's not the best one. As you were saying, maybe it's not. It's hard to get a handle on where actually the, not to put too fine a point on it, where the lie is when we're making progress. Well, that progress is so hard to define when you're dealing with a very troubled company. What is progress to some is just digging a deeper hole to others. What is the quintessential misstatement, reckless statement in your mind? You gave examples here, but what really captures in your mind where Weatherford was violating securities law? Okay, I'll give two. Just one example. If I could, I'll give two examples. They're overwhelming. Just one example. I can give you three or four if you want to be overwhelmed. I'll do my best not to do that. The first one is Mr. Shiverum said in the beginning of the class period, the first day of the class period, he said we are making our payments to our vendors regularly, and very importantly, we're regularly making payments to our vendors, and then goes on to make the statement that in the October 2016 call or whatever that was, is it clear that by then they were already delaying 60, 90 days paying vendors? Yes, yes. By that time? We have one of the FVs saying that that particular practice started in 2015, and I also want to point out that was material to the investors and to the analysts because they knew that Weatherford had had a problem in the past of not paying on time. But I want to point out what he said in the second half. I believe that. What is the significance, which is relied on in part in your friend's brief, that you actually had the financial data being given to you, the actual numbers? I don't see in your briefing where you were saying any of the numbers that they were providing to you, showing what expenses were, what the income were, whatever else, that any of those were incorrect. What is the impact of that on your argument that these overall articulations of progress, if not belied or at least informed by the actual numbers, how does that fit into our analysis? Are you talking about Mr. Shiverum's statement about the payments to the vendors? Or were you talking about something else? Well, that's one thing. I mean, you would think the financials that they're providing, whatever period that the actual financial information is provided by the company, the data, the numbers, that they are showing what's coming in from vendors and what's going out to vendors. Well, as we say in our argument, what's going on there is that by delaying the payments to vendors, they're giving the appearance of making revenue and therefore profitability in a certain quarter, when in reality they're not actually making the payment until later on. But again, I want to come back to that statement. There are three types of statements. The ones about the transformation plan may be tied to the financial. That's why I keep coming back to the P&L. This statement, he says, we're making payments to vendors, which in a sense is similar to paying down debt obligations. That second part of the sentence is very important because if it's something that they... You're still answering my question. Okay, good. I want to get my five minutes if I could. That by saying that they're paying down the debt obligations, he's basically trying to make the impression that the company is going to climb out of debt. And again, I want to reiterate what I said earlier. It's not a question that at a certain point in time they're going to climb out. I don't believe, despite what the defendants might suggest, that the investors believed that they were saying we're coming out of bankruptcy tomorrow or we're coming out of debt tomorrow. No-one's saying that. But in this statement, he's telling them we're paying our vendors, which is similar to paying down debt obligations. It's on an upswing. But we have allegations which come from multiple FEs that they were delaying their payments to vendors. They were not doing what they were saying, so therefore they were not paying down debt obligations. I don't want to avoid questions, but... You'll be back. If you ask me back, I will be.  Thank you, Your Honor. Mr. Walden. Good afternoon, Your Honors. Peter Walden, on behalf of the defendant, Napolese. Your Honors, this case was properly dismissed. Although plaintiff initially challenged 32 statements in its complaint, plaintiff's appellate briefing  and the plaintiff's appeal has not yet been heard. And it doesn't include the statement that counsel just offered to the court as illustrative... Are you talking about the statements as they're actually discussed in the analysis section, or are you talking about the total that's in the statement of facts? Your Honor, under this court's jurisprudence, as I know the court appreciates, if statements are not raised in the argument section, they're waived. Counsel, my trouble with that is, and you may be partially right, but it seems to me that if there's a... But first, under 9b, you've got to list them in the complaint. So whatever's in the complaint's our starting process. And then when you're looking at the appellate brief, whatever may have been waived in district court, but you're not talking about that, once you look at the appellate brief, it seems to me if they have a list in there in the factual statement, and then when they get to an analysis and say these and the other statements that we've identified fit this category, these particular statements fit this category, I mean, I'm a little lost. I mean, it's a fair point, and we are zealous of our need for good argument, but it does seem to me some sort of collective reference to what's been identified in the statement of facts is suitable. Well, if I may, Your Honor, let me just take on the vendor payment statement. The vendor payment statement was not raised at all. If I look in the brief, I won't find that anywhere? Well, you may find a reference to vendors and to delays in vendor statements, but the prejudice to us was in writing our opposition brief, we took at face value the circuit's rule on addressing the specific statements that are raised, and that's what we did. But, Your Honor, I don't want to argue over something that could be a technicality. You may be right, but I do think maybe you could be pressing the point a little bit too far. All right, let me take it on the merits then. Mr. Shivram's statement in October of 2016? Fifteen. Sixteen. We have been making normal payments to our vendors, which in a sense is similar to paying down debt obligations. This statement was not false or misleading. The plaintiffs don't allege any particularized facts showing that as of October 2016, the company had not been making normal payments. They have F.E. allegations which purport to say that at various times before and during the class period, they delayed vendor payments. But nobody testifies that Mr. Shivram's statement that as of October 2016, they had been making normal payments to vendors was false. You won't find an F.E. allegation that says that. I see the issue of the word normal as opposed to... I mean, how Weatherford usually does business may be delaying 90 days.  I'm not quibbling. You are not quibble. Are you focusing on the word normal at all? We think that there are no F.E. allegations, there are no facts alleged, Your Honor, which shows that that statement was false because they allege that prior to the class period, they did delay payments, and they allege that during the class period, they did delay payments. And there's nothing wrong with delaying payments. Counsel made an argument that it somehow showed that the financial statements were false. Well, that's not true. The plaintiffs don't allege that any number in the financial statements was false. If you don't make payments, they show up on the financial statements as accounts payable. And everybody understands that when they read. And the question with respect to that, Your Honor, Your Honors, is what are the allegations about what the vendors said? I mean, the vendors, you know, frequently work with companies who are in distress and accept extended payment terms. Sometimes there's quid pro quo for them, but there's nothing alleged in the complaint which says that this was a lie, that this was something that was not allowed by the vendors. This was something that, you know, the company hid. I mean, the notion that this was a falsehood is belied by the allegation that the CEO of the company sent a company-wide email talking about the new policies. And I think this is in 2018, not 2016. Mr. McCollum didn't even come to the company until 2017. But a new policy on delayed vendor payments. And Judge Hughes made this point that these allegations are across time periods. They're not specific to individuals. And it's a real problem in a fraud case under the PSLRA where the plaintiff's burden is to be very specific about the statement that's being challenged and very specific about the reasons that it was a lie. Counsel, what's the line between puffery and, shall we say, over-optimism? I mean, when do you fall into misrepresentations? I think, Your Honor, if something is deemed to be an objectively verifiable fact as a phrase that courts have used, as opposed to the kinds of adjectives that the plaintiffs attack in this case, which have consistently been held by this court and others, to be puffery because they're not objectively verifiable. So if you say we're making progress or we're making material progress... We've cited a number of cases where appellate courts, and I believe this one, have found that that is not sufficiently concrete to be actionable. It is, in fact, puffery. But if you... We're not even thinking about bankruptcy. I don't spend any time planning to fail and you're meeting with bankruptcy counsel or hiring, restructuring... Your Honor, you will search the complaint in vain for a statement that any defendant said we're not contemplating bankruptcy. The defendant, starting in February of 2017, published ten Ks and ten Qs that specifically said, this is what our hope is, this is what our plan is, but if it doesn't work out and the oil market continues to go south and our customers don't spend money, it may not succeed. And if it doesn't succeed, we could go bankrupt. I want to come back to the question on material progress. The truth of the matter is, and again, the plaintiffs don't controvert this, is that by the end of 2018, the company had realized 40% of its transformation plan goal. The plaintiffs don't disagree with that. That was a published statement. What does 40% mean? Let's say it's $6 billion, $7 billion debt. Right. Does the 40% have any correlation to the amount of debt, which may not be the right label, or is it just a correlation that you had 100 things to do on the transportation transformation plan and you did 40% of them? I think the relationship is as follows, Your Honor, and I don't think that there's anything in the plaintiff's arguments that controverts this. The plan was to realize $1 billion in EBITDA, which has different components. It's got a revenue component. It's got a cost component. The 40% was that by the end of 2018, the company had realized $400 million of the $1 billion goal, and they were very clear in early 2019 that they were coming up with against, you know, the continuing decline in the oil market, and they were going to need to talk to their lenders in the first quarter of 2019 to see if the lenders would support a restructuring of the balance sheet, a renegotiation of the debt, so that they would have additional time to try to get the transformation plan to the goal that it had and to work out of the oil slump, and what happened during the first quarter of 2019 is that the market continued to decline. The company continued to suffer operational results as a consequence because their customers weren't spending money on their products and services because of the decline in the market, and the lenders basically said, Look, we've been working with you, but it's over. We're not going to work with you anymore. And so the risk that had been outlined time and time again by the company for two years in all of its SEC filings, filings which are not claimed by the plaintiffs to have been fraudulent or wrong even, that risk materialized, but it was a disclosed risk that materialized, not an undisclosed risk. To what extent did your client, you have a variety of clients, did the company include frequently each time a cautionary language that identified factors that could cause some of the optimism not to be realized, such as the price of oil? And the high level of indebtedness? Yeah. How frequently and how specifically were such cautions given along with such statements as no existential liquidity issues, material and impressive progress, et cetera? The no existential liquidity issue is from October of 2016. You know, existential liquidity issue not imminent now. The company doesn't declare bankruptcy for 32 months. I use those examples really to see if you can hook to that cautionary language that was given simultaneously, not in the same statement. Yes. Simultaneously in the same event. Here's what this is based on. Here's what's got to happen for that to occur. And our brief, Your Honor, cites SEC filings 10-Qs, 10-Ks, press releases, in which the company says, in order for this to work, we are going to need to achieve our EBITDA goal of a billion-dollar transformation. Somehow we're going to need to achieve that. And if the oil market continues to go bad, there is absolutely no certainty that we're going to be able to do so, both from a cost and from a revenue point of view. And there are those warnings, Your Honor, which the other side labels generic, but they're the opposite of generic warnings of the kind that were rejected in, I think it was the Barry case that they cite, where it just said it didn't have anything to do with the specific risk that was at issue. The risk here is the risk of bankruptcy. Here the risk of bankruptcy was not only noted in every single one of those SEC filings, but it was also described what could go wrong specifically that would cause the company not to be able to realize its goals. There's some back-and-forth here, but also in the briefing about the bankruptcy angle. Uh...Duroc Donner, I guess, Danner said no remote possibility that Dick could not be... I can't read my own handwriting...managed. And I think he was the one who said, I don't contemplate, don't spend... waste my time contemplating such things. The case you cite that said there's no duty to disclose potential bankruptcy or talking to Bankruptcy Council is a Second Circuit opinion, Walser v. UAL. Not the most significant case, pro se, plain deferrati of things. But it does support in a footnote that if you have stated something that the duty to disclose... generally it would have a duty to disclose that you're talking to Bankruptcy Council. But if your company had said something earlier that is now inconsistent because you're now talking to Bankruptcy Council, that could trigger the duty to disclose. Isn't...aren't some of the statements by... Duroc Donner, if I'm saying his name correctly, and some of these others, suggesting we're not going that way and maybe this is now indicating you need to update that information. I think that's how it was put, to update. Why is there the need for an update since you've already declared the opposite? Your Honor, I agree with your recitation of the law. Let me take... You understood what I said? I'm sorry? I'm not even sure what I said, so I appreciate your indication. No, there are a number of cases that say there may not be a duty to disclose something. In this case, I think it's commonplace between the defendants and the plaintiffs that the defendants did not have a duty to disclose the retention of Bankruptcy Council if they actually retained Bankruptcy Council, which I'll come up, which I'll call on. But if they make an affirmative statement that paints an inaccurate portrait, unless they disclose that, then they might have a duty based on the affirmative statement that they made. The defendants here never made an affirmative statement that they weren't going to have to declare bankruptcy. They said exactly the opposite for 2½ years, that they might well have to declare bankruptcy. The Duroc Donner statement, he's the former CEO. He leaves in 2016 or early 2000. Did he leave very soon after this, October 2016? Yes, he did. And the statement that's attributed to him is that he saw... The only part they challenge, Your Honor, pardon me, is that he saw no remote possibility that... that the company won't be able to manage its debt and navigate the oil slump. That statement is made on November 9th of 2016. The bankruptcy filing is May of 2019. This is not even remotely temporarily linked, and it is an opinion statement by Mr. Duroc Donner.  that he didn't genuinely hold that belief in November of 2016, and they don't argue that he failed to disclose something that he needed to disclose about the inquiry that he had made to reach that point of view. Both of those things would be required under the Supreme Court's decision in Omnicare. So that's Duroc Donner. With respect to Mr. McCollum, the specific statement that is picked out in the reply brief, not in the opening brief, is, quote, I don't waste a lot of time thinking or planning how to fail. That's what the plaintiffs attack. I don't waste a lot of time thinking or planning how to fail. That's it. We hope that most CEOs don't waste a lot of time on anything, let alone on thinking or planning or planning how to fail. But in any event, Your Honor, as the plaintiffs themselves alleged, the counsel that they're talking about having retained are the advisors, Alvarez and Marcell, and then another law firm, which they retained in late 2018, are not simply to file for bankruptcy proceedings. This is before the first quarter of 2019 even occurs, before the company gets buffeted by a continuing decline in the oil market, and before their lenders tell them we aren't going to support you anymore. Alvarez and Marcell and the law firm are retained in late 2018 as the plaintiffs themselves allege to talk about refinancing, restructuring the debt so that they aren't up against the maturities that are going to come due. And so even if there was some duty to discuss the retention of bankruptcy counsel, it's very hard to imagine how that duty was violated when in the 2017 10-K, the 2016 10-K published in February of 2017, the 2017 10-K published in February of 2018, the 2018 10-K published in February of 2019, 15 days after Mr. McCollum makes this statement that the plaintiffs attack, 15 days after that, the company puts out a 10-K which says, you know what? The market is continuing to go south. We're having a lot of problems. As we've told you, we are hopeful because we made a 40% progress in our transformation plan at the end of 2018 that we will go forward, but we are going to need to talk to our lenders and get our lenders' support to have this happen. It couldn't have been more transparent, and what happened to the company was still in the future. When you look at the May 2019 statement, it's about what happened in the first quarter of calendar year 2019. Let me ask you about something I don't believe opposing counsel raised, which is Scienter, if I have forgotten. You mentioned it. I apologize. It seems like Judge Hughes may have gotten a little bit too focused on motive. It is a factor in trying to figure out Scienter as well. I don't think Judge Hughes' opinion certainly controls what we do. There's no Scienter if these statements don't violate securities law in the first place. It does seem to me there are some questionable statements here. Maybe we'll all come out your way. Maybe we'll all come out your friend's way on the other side. Tell me why Scienter isn't here. It seems to me if these statements are indeed inconsistent with what was really going on within the company, that's the kind of reckless conduct that qualifies as Scienter. No? Your Honor, Judge Hughes did, I think rightfully, under this court's jurisprudence focus on motive, but to the extent that he didn't cover other bases, let me do that now. One is that, as this court has recognized, and I would cite the court to Judge Higginson's opinion in the Nieman v. Bowman, I'll get the name right, Your Honor, but it's the Nieman case. The much-cited Nieman case. The much-cited Nieman case, yes, yes indeed. As he noted, it's a funny fraud indeed when the defendants spend as much time as these defendants spent for a two-and-a-half-year period describing to the market all of the challenges that they confronted first. Second of all, published financial statements that the plaintiffs don't claim were false. So the market had exactly the information that the market needed to have in order to understand the company's financial condition. What the market didn't know was whether or not the company was going to be successful in persuading its lenders to stand with them. And as the Nieman case makes clear, Judge Southwick, where there is that robust disclosure, where there is that kind of disclosure, which is cited at length in our brief, that clearly cuts against an inference, let alone a strong and compelling inference of Sienner. Fraudsters don't do that kind of thing. They don't tell the market the truth. They don't publish financial statements that are accurate. And they don't give the kind of detailed, specific risk warnings that were given here. And I think it's, as Judge Higginson noted in Nieman, it's the combination of the motive, the paucity of the motive, and if I can use the word, the almost surreal notion that two different management teams over a 30-month period would attempt to keep a fraud going for no obvious benefit. There's no insider stock sales for the negotiation of a management incentive plan at the end of the 30 months that they have no entitlement to participate in, that they don't end up in a situation and that isn't alleged to be outsized at all. Let me ask you about the reorganization. Your time is up, but this is a factual question I hope you can address easily. Has there been any litigation, it seems to me, before the year was out, Chapter 11 restructuring occurred. Has that been appealed? Has that been contested as a result of the bankruptcy? Your Honor, I should know the answer to that. I don't believe that it was contested. I believe that it has been. There's been no reference to such. It's not pending in the Fifth Circuit. No. And, you know, the bankruptcy court specifically found that the plan was negotiated in good faith, including the management incentive plan. Part of the motive that's suggested by the briefing on the other side is to place themselves in a better position at restructuring than they otherwise would have been. But that's in the briefing. You don't need to... Understood, Your Honor. But then they need to make allegations that show that that happened and that that's not even a close question because none of these defendants participated in it and there's no evidence of it. Thank you, Your Honors. Thank you, Counsel. Thank you, Mr. Barolo. Mr. Rogers, you have five minutes on the clock. I feel like I better run to the lectern to get started here. Do you hear him all right? What's that? Do you hear Judge Dennis all right? I'm sorry, Judge Dennis. Well, no, he just said it was your turn and you were coming up. I just wasn't sure you could hear what he was saying. I did. All right, there's a lot to cover so let me jump into it. There's really two things I'd like to address from what Mr. Wald was saying and the bench... How much rebuttal time does he get? I'd love the 1940 I have here. I don't think that's accurate. We're looking forward to it as well. Oh, it's five now. Oh, my God. Okay. I'd like to look to the Mr. McCollum statement where he said I don't waste a lot of time. Mr. Wald, and he did it in his brief, ignores the important part of that statement which is that it was in response to a question. And it was in response to a question basically asking, and I'm paraphrasing, are you guys going to go bankrupt? What's going on here? You've been in debt. We know you're in debt. Use transformation plan, you know, one quarter it's good and when it's not, you know, things are... They'd already had the prior announcement, don't forget that. They had the first partial corrective at this point. And they ask him, you know, what's the deal? How are you going to go bankrupt? And he says, I don't waste a lot of time thinking about planning how to fail. Now at that point, they'd already retained Alvarez and Marcel. But isn't that really a non-answer? It's not a... It's not a false answer. It seems to me it's a non-answer. I agree with you a hundred percent, Your Honor. It is a non-answer. But it's not saying we may not, bankruptcy may not be ahead. It said I'm this positive guy. I don't spend a lot of time thinking about failing. Well, here's what he could have... Here's an example. I'm an optimistic man. I've had faith in the transformation plan and I'm going to continue to have faith. We've retained Alvarez and Marcel as consultant. We've retained Lazard Frere as law firm. Not to go into liquidation. Not to file Chapter 11. You're saying that's what he should have said? Something along those lines. Because the question was, are you contemplating bankruptcy?  no, we're not. But he was contemplating it. Was it imminent? I don't know. If we get the discovery, we'll find out. But if it's not imminent, we'll find that out. Was it going to happen in two months or five months? I don't know. If we get the discovery, we'll find that out. But he was contemplating it and he said he wasn't. And that is an actionable omission because the question... About something you raised, I meant to do it your first round. What would be different on this case if it were not dismissed  discovery, whatever else? I mean, basically, we know what the allegations are. We know what was said by the company that you say could have been responsible for creating the securities violation. What benefit is there from discovery or anything else? Don't we know enough right now to know if you have a case? Obviously, you think... Well, from my perspective, you're ready to let us go to the jury. Would discovery add anything to what we know right now as to whether you have a case? Well, I really hate to parse the answer, but for the pleadings, I think we've done all we can. I know, as well as Your Honor, that summary judgment is a very different standard. If we go to trial, we have to convince the trier of fact. As great as I think our complaint is, it's not going to carry the day with the fact finder. We need discovery to turn that in. Mr. Walt wants to say that it's a he-said-she-said thing. Oh, 15 FEs. They're all wrong. Mr. Durack-Danner, Mr. McAllen, they're right. All right? Let's take some depositions. Let's get some testimony. Let's get some docs. That's how we find that out. At this point, the information's in his hands, not in mine. I'm sorry. I'm not sure that answered your question. Well, Mr. Warner, that's obviously a decision we need to make. Do we know enough about this case now if we were tending to agree? Am I saying we are tending to agree with Judge Hughes? Would we know more about it? Is part of what the problem is now is that it didn't go further? Well, that leads me to a second question, which I was going to talk more specifically about Seantor. Lawyers always say, with all due respect, I mean that. I'm talking about a federal judge. I don't know what Judge Hughes did below. And, you know, you've seen the five-page opinion. So do I think remand would be helpful? Yes. Also. What's that? I'm sorry, sir. Also is also a five-page opinion. Yeah, well, if we were remanded, it would maybe we would get a sense of what he did or didn't think about the allegations. And again, I'm not going to beat around this bush. I think we should get into discovery and we're going to find a lot more answers. Judge Hughes may not have the answer   we're going to  our case. We're going to have to prove our case. We're going to have to demonstrate that the CWs, that the information is corroborated by the internal documentary evidence. You know, the complaint is not evidence. We all know that. We have to get documents, take depositions, test some of the individual defendants, what they did or didn't know. They're under oath. We assume they're going to tell the truth when they're deposed. We just present our case at trial. But you are sort of answering my question in an indirect way. I didn't ask it quite this way, but it does seem to me that discovery is not going to tell us more about whether this really is a securities violation or not. It will allow you to come up with the evidence to support what your former employees are saying, but it's not going to give us a better sense of whether what you've alleged is actually a securities violation. Is that a fair statement? I mean, I don't agree with the implied conclusion, but it is a fair question. I do believe, as I said earlier, just to give a couple of examples, the statements are not forward-looking, so I think they're actionable. We meet Rule 9B particularity. I feel very confident about that. We have 15 CWs with all the various particularized allegations. We have a strong inference of scienter through recklessness in some cases and knowledge in another. That's the pleading standard. Then, you know, off to discovery and you prove your case. I'm confident if we get to discovery, Mr. Wald's going to move for summary judgment. I don't think I'm wrong on that one. And if we go to trial, we're going to have to convince a jury of my peers that there's fraud here.  we've plead      Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.    Thank you.